IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

AMERICAN ADDICTION CENTERS, )
INC., RECOVERY BRANDS, LLC, and )
ADDICTION LABS OF AMERICA, LLC, )
       )
      Plaintiffs, )
       )     NO. 3:19-cv-00376
v.                 )     JUDGE RICHARDSON
       )
NATIONAL ASSOCIATION OF )
ADDICTION TREATMENT )
PROVIDERS, )
       )
      Defendant. )

## MEMORANDUM OPINION

Pending before the Court is Defendant's Motion to Dismiss First Amended Complaint (Doc. No. 31, "Motion"). Plaintiffs have responded to the Motion (Doc. No. 39), and Defendant has filed a reply (Doc. No. 43).

## BACKGROUND [1]

Plaintiff American Addiction Centers ("AAC") is a for-profit corporation and leading provider of inpatient and outpatient substance abuse treatment services for adults struggling with drug addiction, alcoholism, and co-occurring mental/behavioral health issues. Plaintiff Recovery Brands, LLC ("Recovery Brands") operates a portfolio of informational websites that help those suffering from addiction to find information, including directories of treatment providers, about treatment options and recovery. Plaintiff Addiction Labs of America ("ALA") operates a testing

---

[1] For purposes of the Motion, unless otherwise noted, these facts are taken from the First Amended Complaint ("FAC") and must be accepted as true.

laboratory, the customers or potential customers of which include patients being treated at both AAC and non-AAC treatment facilities. Plaintiffs together will be referred to herein as "Plaintiffs."

Defendant National Association of Addiction Treatment Providers ("NAATP") is an addiction treatment industry trade association that boasts of a nationwide membership in excess of 600 different providers and more than 930 different treatment facilities. Plaintiffs allege that NAATP has positioned itself as the *de facto* regulator of the addiction treatment industry and has sought to damage Plaintiffs and their reputations through lying about Plaintiffs' practices, excluding Plaintiffs from its membership, blocking Plaintiffs' participation in online advertising platforms, threatening retaliation against its members who use Plaintiffs' services, barring membership to all providers who own or operate online directories or use marketing channels not controlled or approved by NAATP, and applying its restrictive standards to Plaintiffs and not to others.

The 396-paragraph First Amended Complaint ("FAC") asserts causes of action for: (1) violation of the Lanham Act; (2) defamation; (3) tortious interference with business relationships; (4) breach of contract and breach of the duty of good faith and fair dealing; and (5) violation of the Tennessee Consumer Protection Act. Defendant has moved to dismiss all of Plaintiffs' claims for failure to state claims upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6).

## MOTION TO DISMISS STANDARD

For purposes of a motion to dismiss under Rule 12(b)(6), the Court must take all the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged. *Id.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id.* at 1950. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id.*; *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id.* at 681. The question is whether the remaining allegations – factual allegations, *i.e.*, allegations of factual matter – plausibly suggest an entitlement to relief. *Id.* If not, the pleading fails to meet the standard of Fed. R. Civ. P. 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id.* at 683.

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 433 (6th Cir. 2008). That is not to say that the movant has some *evidentiary* burden; as

should be clear from the discussion above, evidence (as opposed to *allegations as construed in light of any cognizable matters outside the pleadings*) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

## DEFENDANT'S ALLEGED OVERARCHING DEFENSES

Defendant initially asserts that three overarching legal concepts "doom" Plaintiffs' claims. The Court will address these defenses in turn.

A. Trade associations have an absolute right to make membership decisions.

Defendant contends that trade associations generally have unlimited discretion to grant or refuse admission or membership, citing to cases more than fifty years old from state courts in other jurisdictions. (Doc. No. 32 at 6). In response, Plaintiffs argue that the general discretion afforded to a trade association's membership decisions has no bearing whatsoever on Plaintiffs' claims. (Doc. No. 39 at 2). The Court agrees with Plaintiffs. Plaintiffs do not ask this Court to force Defendant to admit any one of them into membership,[2] and only one of Plaintiffs' claims seeks damages related to Defendant's exclusion of Plaintiffs from NAATP membership. (Doc. No. 27, Cause No. 4). That claim is one for breach of contract and is based upon an alleged contractual promise, not the lack or abuse) of discretion of the trade association with respect to membership issues. (*Id.* at ¶¶ 367-381).

Therefore, this "overarching legal concept" does not apply.

---

[2] The only injunctive relief sought relates to the alleged false and misleading statements. (Doc. No. 27 at 69).

B. <u>Defendant is entitled to absolute immunity and qualified privilege.</u>

Defendant contends that it is absolutely immune[3] for any communications with or testimony before members of Congress.[4] Plaintiffs respond that they have not sued based upon communications with Congress or made during congressional hearings; rather, the only claims related to Defendant's alleged false and defamatory congressional testimony arise from Defendant's *republication* (to the public) of such testimonial statements—actions that fall outside the absolute-immunity doctrine upon which Defendant relies. In reply, Defendant claims that simply alerting a new audience to the existence of a preexisting statement does not republish it, citing *Clark v. Viacom Int'l Inc.*, 617 F. App'x 495 (6th Cir. 2015), without explaining how its asserted principle applies herein.

Defendant's reliance upon *Clark* under these facts is not well taken. *Clark* involved a defendant who made certain statements "continuously available" on its website, and the plaintiffs argued that the statements were "republished" each time there were changes in the commercial advertisements around the borders of the website. *Clark*, 617 F. App'x at 506-07. The court stated

---

[3] Statements made during judicial or legislative proceedings are absolutely privileged as long as they are relevant and pertinent to the matters being discussed. *Evans v. Nashville Banner Pub. Co.*, No. 87-164-II, 1988 WL 105718, at *3 (Tenn. Ct. App. Oct. 12, 1988) (citing *Logan's Super Mkts., Inc. v. McCalla,* 343 S.W.2d 892, 894 (1961) (involving legislative proceedings)). Thus, they cannot be the basis of a defamation action, even if they are false, known to be false, or malicious. *Jones v. Trice*, 210 Tenn. 535, 548, 360 S.W.2d 48, 54 (1962), *cited in Bose v. Bea*, 947 F.3d 983, 994 (6th Cir. 2020); *see also Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 790 (6th Cir. 2007) (under "*Noerr-Pennington* doctrine," parties who petition government for governmental action favorable to them are immune from antitrust scrutiny, and the doctrine extends to common law torts).

[4] The FAC alleges that Defendant, through its representatives, "testified" before the Subcommittee on Oversight and Investigations of the U.S. House of Representatives Energy and Commerce Committee on December 12, 2017 (Doc. No. 27 at ¶¶ 137-141) and again on July 24, 2018 (Doc. No. 142-150, 153). Plaintiffs contend that this testimony, later republished by Defendant, was defamatory.

that an online statement is not republished every time its window dressing is altered and that "simply alerting a new audience to the existence of a preexisting statement does not republish it." *Id.* at 507. *Clark* certainly has something to say about when a statement should be deemed "republished." *Clark* does not say, however, that a statement entitled to absolute immunity when first made (based on the circumstances of such making) is subject to the same absolute immunity when made later under different circumstances; it is certainly conceivable, for all *Clark* indicates, that the answer is "no" even if the second making could be considered a "republication." Moreover, *Clark* is distinguishable on its facts, in particular because the "republication" in *Clark* was in form and substance much closer to the original publication than is the alleged republication in this case. Plaintiffs here allege that Defendant "republished" the statements made before Congress via entirely different means of communication (at its annual meeting and via websites and media outlets), not that Defendant simply changed the presentation to Congress or changed an existing presentation on its websites. (*e.g.,* Doc. No. 27 at ¶¶ 58 and 136-141). The Court does not see a basis, from *Clark* or otherwise, to recognize absolute immunity as to the alleged republications here at issue. For purposes of this Motion, therefore, Plaintiff has sufficiently alleged claims for which Defendant is not entitled to absolute immunity.

Defendant also argues that it is entitled to a "qualified common interest privilege" for "all communications made in good faith upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty," citing *Southern Ice Co. v. Black*, 189 S.W. 861 (Tenn. 1916). It is interesting that Defendant chose to quote a case that is more than 100 years old and limits this privilege to communications "made in good faith." This requirement of good faith is still existing law. *See, e.g., Bohler v. City of Fairview*, No. 3:17-cv-1373, 2018 WL 5786234, at *15 (M.D. Tenn. Nov. 5, 2018) (common interest privilege premised on good faith);

*Grant v. Commercial Appeal*, No. W2015-00208-COA-R3-CV, 2015 WL 5772524, at *10 (Tenn. Ct. App. Sept. 18, 2015) (qualified privilege may be defeated if defamatory publication made with malice, ill-will, or for an improper purpose).

The FAC clearly alleges that the defamatory statements Defendant made were deliberately and willfully made and made with actual malice. (*e.g.,* Doc. No. 27 at ¶¶ 58, 136, 279, 321-24, 328-29, 345, 361, and 389). Plaintiffs have sufficiently alleged that Defendant's actions were not taken in good faith, so for purposes of this Motion, the qualified privilege asserted by Defendant does not apply.

This is actually a straightforward application of a basic principle. As the Sixth Circuit has explained:

> "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015). We clarified, "Although an officer's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Id.* at 433–34 (internal marks and citations omitted).

*Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). The Court does not see why this principle would not apply to Defendant's assertion of a qualified privilege, just as it applies to assertions of qualified immunity. In fact, extant case law indicates that it does apply to assertions of privilege. *See, e.g.*, *Del Monte Int'l, GmbH v. Ticofrut S.A.*, No. 16-23894-CIV, 2017 WL 4901805, at *3 (S.D. Fla. Sept. 27, 2017) ("Because the Court's inquiry on a motion to dismiss is limited to the Complaint, there is no support at this stage for showing that Defendant was privileged in its alleged interference."); *Chapin Revenue Cycle Mgmt., LLC v. JDA eHealth Sys., Inc.*, No. 8:11-cv-858-T-33AEP, 2012 WL 469824, at *4 (M.D. Fla. Feb. 13, 2012) ("Defendants may assert privilege as an affirmative defense, but such an assertion is inappropriate in a motion to dismiss."). And the principle fits perfectly in the present case, given that Plaintiff has included

the kind of factual allegations that, if true, would defeat the asserted qualified privilege. *Cf. The Bradbury Co. v. Teissier-duCros*, 387 F. Supp. 2d 1167, 1175 (D. Kan. 2005) (denying motion to dismiss based on an asserted privilege that required showing of good faith, because a determination on the merits of the defense of privilege was generally one for the jury).

      C. <u>All claims of defamation must satisfy the "actual malice" standard.</u>

      Defendant also contends that because Plaintiffs AAC and Recovery Brands are "public figures," for purposes of their defamation claims, they must show that Defendant made the alleged defamatory statements with "actual malice."

      If the plaintiff in a defamation case is a public official or public figure, he or she must also prove that the libelous statement was made with actual malice—that is, with knowledge that it was false or with reckless disregard of whether it was false or not. *Hudik v. Fox News Network, LLC*, No. 3:19-cv-00127, 2021 WL 62832, at *5 (M.D. Tenn. Jan. 7, 2021); *Hibdon v. Grabowski*, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)).[5]

      The Court need not determine at this time whether Plaintiffs were "public figures" when the allegedly defamatory statements were made because Plaintiffs have sufficiently alleged that Defendant acted with actual malice when defaming Plaintiffs. (*e.g.,* Doc. No. 27 at ¶¶ 121 (NAATP 2018 Annual Meeting); 136, 141, and 159 (republishing congressional testimony); 250 (concerted effort to damage AAC's business and attack ALA's diagnostic testing services); 300 (defaming

---

[5] Notably, this requirement is not so much an element of defamation under state law as it is a matter of First Amendment protection—a constitutional limitation on state defamation causes of action imposed by the Supreme Court in *Sullivan*, 376 U.S. at 279-80. *Hudik,* 2021 WL 62832, at *5. That is to say, the applicability and substance of the "actual malice" requirement is a matter of federal (constitutional) law. *Id.*

Plaintiffs), and 361 (tortuously interfering with Plaintiffs' business relationships)). The FAC clearly presents an overriding theme that Defendant was "out to get" Plaintiffs and intentionally, maliciously defamed them. In numerous places, Plaintiffs allege that Defendant acted maliciously. (*e.g., Doc. No. 27* at ¶¶ 1, 3, 58, 110, 115, 122, 131-32, 136, 181, 266, 290, 319, 321-22, and 324.) Therefore, even if Plaintiffs were required to allege actual malice because Plaintiffs are public figures (as Defendant claims), which the Court is not deciding at this time, they have sufficiently made such an allegation for purposes of this Motion. With respect to a claim of defamation subject to the "actual malice" standard, "a complaint [is] sufficient if it alleges that [defendants] made public statements that they knew were false . . . while knowing or recklessly disregarding their falsehood". *Wigington v. Metro. Nashville Airport Auth*., 374 F. Supp. 3d 681, 690 (M.D. Tenn. 2019). The First Amended Complaint in this case is just such a complaint.

## LANHAM ACT CLAIMS

The Lanham Act prohibits any person from, in connection with any goods or services, using in commerce any false or misleading representation of fact which, in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of another person's goods, services or commercial activities. 15 U.S.C. § 1125(a)(1)(B).

Plaintiffs allege that Defendant uses the touted benefits of being on its online directory as a means to generate new, dues-paying members and engages in nationwide or regional advertising by and through the use of that directory. (Doc. No. 27 at ¶ 272). Plaintiffs assert that Defendant made false and misleading statements about Plaintiffs' goods, services and commercial activities (including their online directory services) in numerous places, including at Defendant's 2018 annual meeting, at a 2019 national conference, in various publications, and on various websites. (*Id.* at ¶¶ 273-74). Plaintiffs allege that these false and misleading statements were willful, made

with actual malice, and caused injury to Plaintiffs, and they seek injunctive relief and damages. (*Id.* at ¶¶ 279, 281, 284-85).

Defendant first argues that Plaintiffs have no standing to bring this claim. In *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), the Court held that to have statutory standing, any plaintiff asserting a federal statutory violation must: (1) be within the "zone of interest" protected by the statute; and (2) show "proximate causation" between plaintiff's injury and the alleged statutory violation. *Bridgestone Brands, LLC v. Apollo Auto Sales & Servs., Inc.*, No. 15-cv-00857, 2017 WL 11476333, at *7, n.5 (M.D. Tenn. Apr. 27, 2017). Although the zone of interests test is "not especially demanding," a plaintiff must still "allege an injury to a commercial interest in reputation or sales." *Lexmark*, 572 U.S. at 129, *cited in Carhartt, Inc. v. Innovative Textiles, Inc.*, 440 F. Supp. 3d 710, 718 (E.D. Mich. 2020). The proximate-cause element deals with "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Act, Inc. v. Worldwide Interactive Network*, No. 3:18-CV-186, 2020 WL 4195269, at *8 (E.D. Tenn. July 21, 2020) (citing *Lexmark*, 572 U.S. at 133).

Defendant attacks what it calls Plaintiffs' "claim that a trade association must let someone in who wants to be a member or that it cannot communicate the requirements of membership to its members or applicants." With respect to such claim, Defendant argues, Plaintiffs simply do not fall within the zone of interests protected by the Lanham Act. (Doc. No. 32 at 11-12). But Defendant misses the mark here, because Plaintiffs in fact do not claim that Defendant's failure to allow them membership violated the Lanham Act. As indicated above, they claim instead that Defendant's false and misleading statements violated the Lanham Act. Moreover, Plaintiffs claim that Defendant did more than merely communicate the requirements of membership; instead, Plaintiffs rely on (alleged) misconduct going far beyond that. (Doc. No. 39 at 7-9 and

corresponding cites to the FAC). This argument by Defendant, its only specific argument as to standing, fails.

Defendant also contends that Plaintiffs have not alleged that Defendant's alleged false and misleading statements were part of a "commercial advertisement or promotion." The Sixth Circuit has defined "commercial advertising or promotion" as: (1) commercial speech; (2) for the purpose of influencing customers to buy the defendant's goods or services; (3) that is disseminated either widely enough to the relevant purchasing public to constitute advertising or promotion within that industry or to a substantial portion of the plaintiff's or defendant's existing customer or client base. *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 801 (6th Cir. 2015), *cited in Act,* 2020 WL 4195269, at **4–5.

The FAC alleges that Defendant is a competitor of Plaintiffs in interstate commerce in the online directory business, specifically online directories of treatment providers. (Doc. No. 27 at ¶ 272). Plaintiffs also allege that Defendant engages in advertising and promotion through its online directories, websites, and other marketing. (*Id*.) Plaintiffs contend that Defendant made false and misleading statements about Plaintiffs' goods and services that deceived recipients of those statements, many of whom were existing and/or prospective customers of Plaintiffs. Plaintiffs also assert that the specific statements alleged in ¶ 274 of the First Amended Complaint and those cited in response to Defendant's Motion (Doc. No. 39, pp. 7-8, 11) were false and misleading under the Lanham Act. Plaintiffs also have alleged that those defamatory statements caused them harm. (Doc. No. 27 at ¶¶ 269, 277-79, 281-85).

Plaintiffs have asserted that the defamatory statements by Defendant were made for the purpose of influencing addiction treatment centers and other similar providers *not* to purchase online directory or other services from Plaintiffs. (Doc. No. 39 at 8; Doc. No. 27 at ¶ 275-78).

Plaintiffs claim that in light of the position Defendant has attempted to create for itself as the purported ethical "watchdog" of the industry, Defendant's statements that Plaintiffs are unethical or illegal actors were even more material/influential to potential customers. (Doc. No. 39 at 8). The Court finds that Plaintiffs have sufficiently alleged that the statements at issue herein were part of a commercial advertisement or promotion.

Defendant's factual assertions to the contrary (Doc. No. 43 at 2) are of facts outside the pleadings that cannot now be considered (or have their truth, or lack thereof, determined) under the standards governing the current Motion. Moreover, whether each of the alleged false or misleading statements was actually false or misleading cannot be determined on a motion to dismiss. That issue is for another day.

Defendant also argues that Plaintiffs have failed to identify any allegedly false or misleading statements that were anything other than opinions about whether Plaintiff AAC was or could become in compliance with Defendant's Code of Ethics. This blanket, conclusory statement is not supported by any citations to authority.[6] Neither does Defendant cite to any specific alleged defamatory statements or show how they were simply opinions. The Court will not do Defendant's work and parse each alleged defamatory statement from the FAC. Defendant has not carried its burden, and the Motion as to this point will be denied.

---

[6] A Lanham Act claim must be based upon a statement of fact, not of opinion. *Act, Inc.,* 2020 WL 4195269, at *6. This is because statements of fact, which can violate the Lanham Act, are generally "provable" and "verifiable," whereas statements of opinion, which cannot violate the Lanham Act, are subjective, imprecise, and incapable of being proven true or false. *Id.*; *see also Serv. Jewelry Repair, Inc. v. Cumulus Broad., LLC*, 145 F. Supp. 3d 737, 747 (M.D. Tenn. 2015) (statement that is actionable under the Lanham Act must be a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact).

Finally, Defendant contends that claims as to any alleged statements communicated prior to May 6, 2019 (the Court assumes Defendant means *2018*, since this action was filed on May 6, 2019) are barred by laches. The Lanham Act does not contain a statute of limitations, so determining whether a Lanham Act claim is time-barred depends upon the defendant's ability to show that the claim is barred by laches.[7] *Kehoe Component Sales Inc. v. Best Lighting Prod., Inc.*, 796 F.3d 576, 584 (6th Cir. 2015). "Laches is the negligent and unintentional failure to protect one's rights." *Id.* Under the doctrine of laches, a claim is barred if there was an unreasonable delay by the plaintiff in filing the claim that materially prejudices the defendant. *CMH Mfg., Inc. v. U.S. GreenFiber, LLC*, No. 3:12-273, 2013 WL 3324292, at *3 (E.D. Tenn. July 1, 2013).

Defendant challenges on laches grounds only one claim, that being Plaintiffs' claim related to Defendant's communications with Google in 2016 and 2017.[8] (Doc. No. 32 at 14). However, Plaintiffs do not claim that those communications violated the Lanham Act. On the other hand, Plaintiffs do identify other statements allegedly made in violation of the Lanham Act and made more than one year prior to the filing of this lawsuit. *See* Doc. No. 39 at 7-8 and 14 ("The only statements at issue in the Lanham Act false advertising claim that took place more than a year before the filing of this lawsuit are statements made by NAATP representatives at the December 12, 2017 U.S. House of Representatives Energy and Commerce Committee meeting that were then republished by NAATP and its representatives on various websites in May 2018.") In other words,

---

[7] The doctrine of laches cannot be invoked to bar legal relief in the face of a statute of limitations enacted by Congress. *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954, 959 (2017). That is to say, where legal relief is subject to a statute of limitations, it is not subject to laches.

[8] Defendant mentions its failure to renew AAC's membership, but the Court does not read the First Amended Complaint as stating a Lanham Act claim based on that failure, which instead forms the basis of Plaintiffs' breach of contract claim.

Plaintiffs have identified claims conceivably subject to laches, albeit not including the claim Defendant believed was subject to laches. Thus, in an abundance of caution, the Court will conduct a laches analysis as to the claims identified by Plaintiffs.

Unlike the operation of statutes of limitations, which turns primary on the amount of time deemed to run against the applicable limitations period, laches is not a mere matter of time, but principally a question of the inequity of permitting the claim to be enforced. *Top Tobacco, L.P. v. Abdelshahed*, 439 F. Supp. 3d 992, 1004 (M.D. Tenn. 2020), *order vacated in part on reconsideration on other grounds*, No. 3:19-cv-00356, 2020 WL 5366523 (M.D. Tenn. Sept. 8, 2020) (quoting *Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, 796 F.3d 576, 584 (6th Cir. 2015)). Ordinarily, a party asserting laches must show (1) a lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it. *Id.* For claims under the Lanham Act, the laches period begins to run when the plaintiff has actual or constructive knowledge of the alleged infringing activity. *Id.*

If the plaintiff has filed its Lanham Act claim within the time that it would have been required to file in the forum state an analogous state-law claim, then the plaintiff's delay in asserting its rights is presumptively reasonable. *Top Tobacco LP,* 439 F. Supp. 3d at 1004 . But a delay beyond the analogous limitations period "is presumptively prejudicial and unreasonable." *Kehoe*, 796 F.3d at 585-86. The presumption that arises after the lapse of an analogous limitations period is not irrebuttable, however; in the end, the laches analysis depends upon whether the plaintiff lacked diligence in asserting its claim and "whether the defendant was prejudiced by the plaintiff's dithering." *Id*. at 585. Essentially, therefore, the court determines (1) whether laches presumptively applies by deciding whether the analogous limitations period under state law expired, and then (2) applies the traditional laches factors (unreasonable delay/lack of diligence by

the plaintiff and prejudice to defendant) to determine whether the presumption (either that laches applies or that laches does not apply) has been overcome. So the laches analysis starts with the analogous state limitations analysis before coming back full circle to a more traditional laches analysis (albeit one that starts with a presumptive outcome by virtue of the limitations analysis).

For the Lanham Act claims in this case, the relevant benchmark is the one-year limitations period prescribed (at Tenn. Code Ann. § 47-18-110) by the Tennessee Consumer Protection Act. *See Johnny's Fine Foods, Inc. v. Johnny's Inc.*, 286 F. Supp. 2d 876, 881 (M.D. Tenn. 2003) (holding one-year TCPA statute of limitations applies to unfair competition claims under 15 U.S.C. § 1125(a)); *Fed. Express Corp. v. U.S. Postal Serv.,* 75 F. Supp. 2d 807, 816 (W.D. Tenn. 1999) (same). Because Plaintiffs filed their Lanham Act claims within one year of the republication at the 2018 annual meeting and thereafter via websites and social media, any delay is, under the above authority, "presumptively reasonable." But that presumption is rebuttable. *Kehoe*, 796 F.3d at 585.

This Court has held that the defense of laches is not appropriate at the motion to dismiss stage because there is no evidence in the record as to the reasonableness of any delay in bringing the action or as to any prejudice suffered by Defendant. *Kenyon v. Clare*, No. 3:16-cv-00191, 2016 WL 6995661, at *4 (M.D. Tenn. Nov. 29, 2016). The strictures of Rule 12(b)(6), wherein dismissal of the claim is based solely on the complainant's pleading, are not readily applicable to a determination of laches. *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993), *cited in James v. J2 Cloud Servs. Inc.*, No. 2:16-cv-05769, 2019 WL 2304157, at *7 (C.D. Cal. May 29, 2019). Although a Rule 12(b)(6) motion may be grounded on an affirmative defense, the defense of laches usually requires factual development beyond the content of the complaint. *Id.* The facts evidencing unreasonableness of the delay, lack of excuse,

and material prejudice to the defendant, are seldom set forth in the complaint, and at this stage of the proceedings cannot be decided against the complainant based solely on presumptions. *Id.* As the undersigned wrote years ago, the assessment of the laches factors is highly subjective. Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L. J. 1015, 1065–67 (1997). This reality likewise counsels against barring any claim based on laches. [9]

As noted above, the only statements at issue in Plaintiffs' Lanham Act claims that also took place more than a year before this lawsuit are Defendant's statements to Congress in December 2017 that were then republished by Defendant in May 2018. The First Amended Complaint alleges that Plaintiffs discovered this false and defamatory testimony in May 2018, when Defendant and its members "republished" it. (Doc. No. 27 at ¶¶ 136-37).

---

[9] Indeed, even the question of which presumption applies is not well suited to resolution on a Rule 12(b)(6) motion to dismiss. The determination of whether the presumption is for or against the application of laches is based, as noted above, on an analysis using the analogous state limitations period. And such an analysis can be a complex, multi-layered one:

> At first glance, the entirety of limitations law seems to comprise little more than a collection of claim-specific statutes from which it is easy to glean deadlines for bringing particular claims. A closer look, however, reveals a far different reality. The statutes tend not to correspond simply to specific claims, and they do not prescribe any deadlines. In fact, limitations law involves far more than the statutes themselves. In reality, finding the applicable statute and divining the actual deadline for a claim requires a confusing multi-step analysis. Although it is important to note that additional steps may be required to address additional issues raised in a limited number of cases, the following discussion sets forth a "core" limitations analysis implicated by a typical case.

Richardson, *supra*, at 1026–27. A plaintiff's complaint cannot be expected to—and typically would not—get into most of the many events and circumstances that ultimately could determine the outcome of the limitations analysis in some cases. Thus, the question of whether a state limitations period unquestionably and unqualifiedly expired (in light of *every possible consideration* and not just the primary considerations) generally is not well suited to resolution at the motion-to-dismiss stage.

Thus, the relevant, benchmark one-year limitations period had not run when Plaintiffs filed their action in May 2019, and any delay in Plaintiffs' filing is therefore presumptively reasonable. In order to rebut that presumption, Defendant must show, as explained above, a lack of diligence by Plaintiffs and prejudice to Defendant. Those issues—when Plaintiffs had reason to know of this claim or reasonably should have discovered it, whether any delay was reasonable, and whether the delay resulted in any prejudice to Defendant—for purposes of this Lanham Act claim, cannot be determined at this point of the litigation. In reviewing this Motion, the Court must accept Plaintiffs' allegations as true, and Plaintiffs have sufficiently alleged that they did not discover the republication of the 2017 testimony until May 2018.

The Court notes that Defendant's arguments with regard to Plaintiffs' Lanham Act claims are painted with a broad brush and fail to show why specific statements should be dismissed. The reality, inconvenient though it may be, is that it often behooves a defendant-movant to address the alleged defamatory statements one by one.[10] The doctrine of laches is an affirmative defense, and Defendant has the burden of ultimately proving it. *Kenyon*, 2016 WL 6995661, at *3. As indicated above, the motion-to-dismiss stage is not the time for either side to "prove" anything with evidence. But it potentially can be a time for a defendant-movant to "prove"—or explain, to be precise—if it can, that laches *necessarily* will apply based on the plaintiffs' allegations (taken as true). Defendant, however, has the burden on a motion to dismiss to explain why any claim(s) should be dismissed based on laches. Defendant has failed to provide—or even attempted to

---

[10] In saying this, the undersigned is not asking for anything that he is unwilling to do himself when necessary. *See Hudik*, 2021 WL 62832, at *8-12 (identifying and analyzing in detail seven different statements implicated by a defamation claim).

provide—such an explanation here as to any claims that any conceivably could be subject to laches. For these reasons, the Motion as to the Lanham Act claims will be denied.

## DEFAMATION

Under Tennessee law, to establish a prima facie case of defamation, a plaintiff must prove that: "(1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Hudik*, 2021 WL 62832, at *4 (quoting *Bohler v. City of Fairview, Tennessee*, 429 F. Supp. 3d 477, 490 (M.D. Tenn. 2019)). Plaintiffs have identified 11 such alleged defamatory statements. (Doc. No. 39 at 15-16 and corresponding cites to the FAC).

Defendant first argues that "almost all" of the alleged defamatory statements are barred by the applicable statute of limitations.[11] The only specific *oral* communications Defendant identifies as being barred by the statute of limitations,[12] however, are the allegedly slanderous statements made by Defendant to Google and LegitScript in 2017 and oral communications at Defendant's National Annual Meeting in May 2018.

Plaintiffs represent that they are not bringing any claims for slander (oral defamation)— for oral statements—that occurred more than six months prior to the filing of the Complaint. In

---

[11] The general rule is that statute-of-limitations defenses are more properly raised in Rule 56 motions for summary judgment, rather than Rule 12(b)(6) motions, because a plaintiff generally need not plead the lack of affirmative defenses to state a valid claim. *Jones v. Invasix Inc.*, No. 3:19-cv-0860, 2020 WL 2542603, at *10 (M.D. Tenn. May 19, 2020). However, if it is apparent from the face of the complaint that the time limit for bringing the claim has passed, then the plaintiff, if she wishes to avoid dismissal, has an obligation to plead facts in avoidance of the statute of limitations defense. *Id.*

[12] Tennessee's limitations period for slander is six months. Tenn. Code Ann. § 28-3-103.

other words, as for the defamatory statements as to which Plaintiffs seek relief, all those that were more than six months prior to the filing of the Complaint were in writing. (Doc. No. 39 at n.2). Thus, especially since the Court will hold Plaintiffs to that representation, Defendant's argument with regard to slander is moot.

The applicable limitations period for libel (written defamation) is one year. Tenn. Code Ann. § 28-3-104(a)(1)(A). Defendant argues that any (and all) alleged libelous statements made prior to May 6, 2018, are also time-barred, but again it does not identify any *specific* such statement. Defendant tries to argue that the discovery rule does not apply to libel, but the case it cites for this argument actually holds that the discovery rule does not apply to *slander*. *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.,* 876 S.W.2d 818 (Tenn. 1994).[13]

Plaintiffs represent that the only communications that pre-date May 6, 2018 and are part of Plaintiffs' defamation claims are: (1) the written communications to Google and LegitScript that pre-date May 6, 2018 and (allegedly) state or imply that Plaintiffs were unethical and/or deceptive bad actors or criminals who needed to be barred from marketing on Google's Ads program; and (2) the (allegedly) false statements made in a December 12, 2017 congressional hearing and republished by Defendant in May 2018. (Doc. No. 39 at 18). As to each of these categories of communications, Plaintiffs claim that Tennessee's "discovery rule" applies and tolls[14] the statute

---

[13] Although the *Quality Auto Parts* opinion states that the rationale for declining to apply the discovery rule to defamation statutes of limitations is persuasive, that statement was made in the context of a claim for *slander* only. *See Quality Auto Parts,* 876 S.W.2d at 821-22.

[14] In the context of limitations, the term "tolling" tends to be used in two different ways. As the undersigned discussed a quarter-century ago, sometimes when a court refers to tolling, it is referring to postponement of the date the statute begins to run, usually the accrual date. By contrast, some courts use the term "tolling" to refer to suspending the running of the limitations period after it already has begun to run. Some tolling provisions cannot be placed comfortably in either tolling category, and some tolling provisions can either postpone the starting of the clock or stop it after it begins running, depending upon the timing of the event that triggers the tolling. Nevertheless,

of limitations until Plaintiffs reasonably discovered or could have discovered the alleged defamation. (*Id.*)[15]

Tennessee courts have held that in cases where the alleged libel is contained within documents not available to the general public, the limitations period begins to run when the plaintiff knew, or with reasonable diligence could have discovered, that it had been defamed. *Watson v. Fogolin*, No. M2009-00327-COA-R3-CV, 2010 WL 1293797, at *4 (Tenn. Ct. App. Apr. 1, 2010) (citing *Leedom v. Bell*, No. 03A01-9704-CV-00136, 1997 WL 671918, at *7 (Tenn. Ct. App. Oct. 29, 1997)). In *Leedom,* the court held that the discovery rule, which ensures fairness by not requiring "that suit be filed when circumstances totally beyond the control of the injured party make it impossible for him to bring suit," should be applied to libel cases. *Id.* (noting a trend to apply the discovery rule in those limited situations where the allegedly libelous statement occurred in private or confidential publications which are not readily available to the plaintiff or the general public); *see also Kinser v. Bechtel Power Corp.,* 868 F. Supp. 2d 702, 704 (E.D. Tenn. 2012) (Tennessee's discovery rule may apply in exceptionally rare instances where the "secretive or inherently undiscoverable" nature of a libelous publication prevents a plaintiff from knowing or discovering through the use of reasonable diligence that he had been defamed).

---

the distinction exists and is analytically important. Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L.J. 1015, 1039–40 (1997). The "tolling" to which Plaintiffs here refer appears to be the first kind, *i.e.*, the postponing of the beginning of the running of the limitations period. (Doc. No. 39 at 18-39).

[15] For most ordinary causes of action, Tennessee courts apply the discovery rule to determine when a cause of action accrues. *Jones*, 2020 WL 2542603, at *10. Under this rule, a cause of action accrues "when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant." *Id.*

Here, Plaintiffs allege that the existence of any written communications between Defendant and Google or LegitScript was kept secret until about a month before the May 20-22, 2018 annual meeting (less than one year prior to the filing of this action). Plaintiffs further allege that it was not until the May 2018 meeting that Defendant first gave any indication that it had, through those written communications, been defaming Plaintiffs to Google and LegitScript. (*e.g.,* Doc. No. 27 at ¶¶ 74-75, 85-89, 120-25, 288-90). Whether these communications were in fact "secret or inherently undiscoverable" until then (like the question of whether Plaintiffs acted with reasonable care and diligence) is a fact-intensive inquiry that is not appropriate for resolution in the context of a motion to dismiss.

With regard to the allegedly false statements made in the December 2017 congressional hearing and republished during the annual meeting on May 20-22, 2018, and thereafter, Plaintiffs argue those statements were not actionable until they were "republished" in May 2018 and, therefore, the statute of limitations ran from May 2018, not from December 2017. The "republication doctrine" provides that "where the same defamer communicates a defamatory statement on several different occasions to the same or different audience, each of those statements constitutes a separate publication," triggering a new the statute of limitations. *Lokhova v. Halper*, 441 F. Supp. 3d 238, 254 (E.D. Va. 2020). Republication includes instances where the publisher has "affirmatively reiterated" the statement. *Id.* The general rationale behind the rule is that if the speaker affirmatively says the same thing again at a later time to a new audience, then he has intended to engender additional reputational harm to the plaintiff. *See Clark,* 617 F. App'x at 504–05.[16] The key factor is whether the speaker intended to and did reach a new audience. *Id.* at 505

---

[16] Defendant cites *Clark* in claiming that simply alerting a new audience to the existence of a preexisting statement does not republish it, but *Clark* also stands for the propositions cited above,

(citing Restatement (Second) of Torts § 577A, cmt. d). Thus, a rebroadcast of a television show, a reprint of a magazine article, or a new edition of a book generally will reset the limitations period because each is produced to garner an audience that the preexisting dissemination of the statement could not reach. *Id.*

The Court finds that Plaintiffs have sufficiently alleged republication by Defendant of the statements Defendant's representatives made first to the congressional committee, a limited audience, and then to a different and broader audience through presentations at the May 2018 annual meeting and thereafter on Defendant's websites. As with Plaintiffs' Lanham Act claims, the question of when Plaintiffs had reason to know of this claim or reasonably should have discovered it (and, thus, when the statute of limitations began to run), for purposes of this defamation claim, cannot be determined at this point of the litigation.

Next, Defendant argues that the alleged defamatory statements published at the 2018 annual meeting were not defamatory.[17] (Doc. No. 32 at 16). Whether a statement "was, in fact, understood by readers in its defamatory sense is ultimately a question for the jury." *Finney v. Jefferson*, No. M2019-00326-COA-R3-CV, 2020 WL 5666698, at *3 (Tenn. Ct. App. Sept. 23,

---

including that the critical consideration is whether the speaker intended to and does reach a new audience. *Clark*, 617 F. App'x at 505.

[17] "For a communication to be libelous, it must constitute a serious threat to the plaintiff's reputation." *Hudik,* 2021 WL 62832 at *4. Libel does not arise simply because the subject of a publication finds the publication annoying, offensive or embarrassing. The words must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule. They must carry with them an element of disgrace. *Davis v. Covenant Presbyterian Church of Nashville*, No. M2014-02400-COA-R9-CV, 2015 WL 5766685, at *3 (Tenn. Ct. App. Sept. 30, 2015). The basis for a claim of defamation is that the defamation has resulted in an injury to the person's character and reputation. *Id.* Courts look to the words themselves and are not bound by the plaintiff's interpretation of them. *Hudik*, 2021 WL 62832 at *4; *see also Tidwell v. Holston Methodist Fed. Credit Union*, No. E2019-01111-COA-R3-CV, 2020 WL 3481537, at *4 (Tenn. Ct. App. June 25, 2020).

2020) (quoting *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 419 (Tenn. 1978)); *Finley v. Kelly*, 384 F. Supp. 3d 898, 906 (M.D. Tenn. 2019). But, as an initial matter, whether a statement "is *capable* of conveying a defamatory meaning is a question of law." *Id.* (emphasis added); *Hudik,* 2021 WL 62832, at *4.

Citing *Revis v. McClean,* 31 S.W.3d 250 (Tenn. Ct. App. 2000), Defendant claims that the alleged defamatory statements made at Defendant's 2018 annual meeting expressed only Defendant's *opinions* about the alleged facts. *Revis* held (in the context of a motion for summary judgment, not a motion to dismiss) that an opinion is not automatically protected by the Constitution and may be actionable as defamatory if the communicated opinion may reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion. *Id.* at 253. Tennessee courts have adopted the rule promulgated in the Restatement 2d of Torts (and followed by the Supreme Court in *Milkovich v. Lorain Journal Co.,* 497 U.S. 1 (1990)) that a statement of opinion is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion. *See Stockdale v. Helper*, No. 3:17-cv-00241, 2020 WL 887593, at *23–24 (M.D. Tenn. Feb. 24, 2020), *aff'd in part, rev'd in part, and remanded on different grounds,* 979 F.3d 498 (6th Cir. 2020).

Plaintiffs identify the first of the allegedly defamatory statements from the 2018 annual meeting as Slide 10 of an allegedly offending slideshow, which states (allegedly falsely) in writing that Plaintiffs' websites are "deceptive" because they are "unbranded, aggregation and lead sales sites" (Doc. No. 39 at 15; Doc. No. 27 at ¶¶ 112-117, 274; Doc. No. 27-1).[18] The FAC alleges that

---

[18] The FAC alleges that these defamatory statements were reflected in the testimony of Defendant's representatives before the congressional committee and then republished by Defendant, with actual malice and/or ill will, to its members at the annual meeting (including on Slides 10 and 13) and thereafter via websites and media outlets. (Doc. No. 27 at ¶¶ 136-56, 158-59, 307).

this allegedly offending slideshow was presented to 700 registered attendees, including hundreds of other addiction treatment providers, many of whom were also customers or potential customers of Plaintiffs' web advertising and diagnostic testing businesses. (*Id.* at ¶ 112). Plaintiffs allege that Slide 10 lists numerous of Plaintiff Recovery Brands' websites under the title "Problematic Practices – Unbranded, Aggregation and Lead Sales Sites," with a sub-title that states: "These are considered deceptive under the NAATP Code of Ethics." (*Id.* at ¶¶ 113-115). Plaintiffs assert that, via Slide 10, Defendant wrongfully and maliciously targeted many of Recovery Brands' websites. (*Id.* at ¶ 115).

Second, Plaintiffs claim that Defendant falsely stated in writing, at its 2018 annual meeting, that Plaintiffs were acting deceptively and unethically because of their "greed" and "desperation." (Doc. No. 39 at 15; Doc. No. 27 at ¶¶ 118-19, 274, 306). Slide 13 of the annual meeting presentation asserts that Defendant was having to "have this conversation" about deceptive and dishonest businesses because those businesses are greedy, desperate, lacking in awareness, and do not have the ability to do it the right way ("more inclined to do things the wrong way"). Plaintiffs contend that Slide 13 referred to Plaintiffs by implication since (according to Plaintiff), taken in context, it referred back to Slide 10, which specifically listed Plaintiffs' websites.

In deciding whether a statement is defamatory in the context of a motion to dismiss, the Tennessee Court of Appeals has observed:

> A trial court may determine that a statement is not defamatory as a matter of law only when "the statement is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense." ... When considering whether a statement is capable of being defamatory, it must be judged within the context it is made.....Additionally, it "should be read as a person of ordinary intelligence would understand [it] in light of the surrounding circumstances." ... To this end, courts are not bound to the plaintiff's interpretation of the allegedly defamatory material, and if the words "do not reasonably have the meaning plaintiff ascribes to them, the court must disregard" plaintiff's interpretation.

*Grant*, 2015 WL 5772524, at *10 (internal citations omitted), *cited in Finley*, 384 F. Supp. 3d at 906; *see also Finney,* 2020 WL 5666698, at *3.

Thus, the Court must consider the context of the alleged defamatory statements. Here, the context is the 2018 annual meeting of Defendant's members (addiction treatment providers and treatment facilities)—at which, Plaintiffs allege, Defendant pursued a "general theme" that attendees (recipients of the message) should not do business with Plaintiffs because Plaintiffs are unethical, deceitful, and dishonest in their business practices. (Doc. No. 39 at 16). Plaintiffs argue that Defendant's statements on Slide 10 imply a knowledge of facts that lead to the conclusion that Plaintiffs' websites *do* tend to deceive people and are "unbranded, aggregation, and lead sales sites," and, therefore, the statements are capable of defamatory meaning.(*Id.* at 20*).* Likewise, Plaintiffs argue that the statements on Slide 13 may reasonably be understood to imply the existence of undisclosed facts, specifically that Plaintiffs were dishonest with patients out of a desire to make money (or, the Court adds, because they were "inclined to do things the wrong way.") Accusing someone of engaging in deceptive practices and being dishonest could (though does not necessarily) hold someone up not just to disapproval and remonstration, but also to hatred, contempt, or ridicule. That may or may not be the message attendees received, but for purposes of this Motion, Plaintiffs have sufficiently alleged facts that, in the alleged context, show that it was.

Importantly, *context matters.* Plaintiffs have asserted, in the FAC, that Defendant positioned itself as the *de facto* regulator for the addiction treatment industry (Doc. No. 27), essentially that Defendant tried to appear as the authority for ethical practices within the addiction treatment industry, so any allegations that Plaintiffs violated Defendant's standards of ethical conduct allegedly took on significant meaning in that industry. The Court reads Plaintiffs' allegations as asserting that if Defendant (as the *de facto* regulator of industry conduct)

"considered" Plaintiffs to be dishonest, that statement would more likely be believed to be true and more likely be a "serious threat" to Plaintiffs' reputation. Again, the Court cannot and need not determine at this time whether that assertion is true or false. But the Court can determine that Plaintiffs have sufficiently alleged facts to support their claim that Defendant's statement is capable of defamatory meaning—which is sufficient for Plaintiffs to prevail at this stage, even if a jury conceivably could find ultimately that this statement does not quite rise to the level of having a defamatory meaning.

Defendant argues that Slide 13 does not even mention Plaintiffs. In the alleged context, however, whether a jury *would* conclude that the second slide referred back to those providers listed on Slide 10 (including Plaintiffs) is a factual issue that cannot be determined at this time; it is enough that the jury *could* so conclude. Similarly, whether Plaintiffs' allegations are true must also be determined in context and is a question for another day. Plaintiffs have sufficiently alleged that Defendant made these allegedly defamatory statements[19] to hundreds of representatives of the industry it purported to regulate—representatives who could be influenced to do or not do business with Plaintiffs.

In light of all these allegations, the Court finds that Plaintiffs have sufficiently alleged the making of statements at the 2018 annual meeting that are *capable* of being defamatory; that is, capable of being a serious threat to Plaintiffs' reputation and capable of reasonably being construed as holding Plaintiffs up to public hatred, contempt or ridicule.

Next, Defendant argues that a number of Plaintiffs' allegations concerning statements in media articles do not even concern Plaintiffs, although Defendant has failed to identify even one

---

[19] The Court has little difficulty concluding that the statements (to the effect that those referred to are "greed[y]" and "desperate") could be taken by a jury as harming their reputation and holding them up to contempt or ridicule (if not hate).

such allegation/media article. Again, the Court will not do Defendant's work for it. To the extent it has arguments concerning specific allegations in specific media, it should have set those forth in order for the Court to address them.

Defendant also asserts, albeit it in a single sentence, that "such claims" are infirm because they are based on mere hyperbole or exaggerated statements. However, once again failing to identify and truly explain what it is they are talking about, Defendant fails to point here to any specific statements. In any event, Tennessee's recognition that "mere hyperbole will not typically amount to defamation is not a general license to propagate falsehoods as long as those falsehoods take the form of overstatement." *Bohler,* 2018 WL 5786234, at *16. And, again, context matters: "Without an appropriate context suggestive of rhetorical hyperbole, overstatement is just another species of falsehood and entirely appropriate for a defamation case if all other requirements are met." *Id.*

Defendant argues again that it is entitled to a qualified common interest privilege for communications made in good faith regarding any subject-matter in which the party communicating has an interest, or in reference to which it has a duty to a person having a corresponding interest or duty. (Doc. No. 32 at 17). Again, the Court notes the term "in good faith" that is crucial to the applicability of the claimed privilege, and it finds that Plaintiffs have sufficiently alleged the absence of good faith (*i.e.*, bad faith), intent and actual malice. *See Bohler,* 2018 WL 5786234, at *15.

Defendant next argues that its republication of the contents of its official testimony to the congressional committee is protected by the "fair report privilege." The basis of the fair report privilege is "the interest of the public in having information made available to it as to what occurs in official proceedings and public meetings." *Burke v. Sparta Newspapers, Inc*., 592 S.W.3d 116,

121 (Tenn. 2019). In *Funk v. Scripps Media, Inc.*, 570 S.W.3d 205 (Tenn. 2019), the Tennessee Supreme Court stated that traditionally, courts held that this privilege applied to "fair and accurate reports of official actions or proceedings. *Id.* at 212.[20]

As the *Funk* opinion notes, however (and the Restatement (2d) of Torts provides): "A person cannot confer this privilege upon himself by making the original defamatory publication himself and then reporting to other people what he had stated. This is true whether the original publication was privileged or not." Restatement (Second) of Torts § 611 (1977), *cited in Funk,* 570 S.W.3d at 217. This provision prevents journalists from using the privilege as a sword rather than a shield. *Id.* It precludes a party republishing its own statement from receiving protection for such republishing based solely on the (alleged) grounds that the republishing constitutes a "fair reporting" of the party's original statement.

Defendant's republishing of the congressional testimony was a republication of its own testimony.[21] Defendant is attempting to confer the fair report privilege upon itself based on its making the original defamatory statements itself and then reporting those statements to others. Such an attempt is prohibited (regardless of whether the testimony originally was subject to congressional immunity) under the Restatement section cited in *Funk* and quoted above.

Next, Defendant contends that Plaintiffs' allegations about remarks by Defendant's Executive Director in two *Alcoholism and Drug Abuse Weekly* articles (July 30, 2018 and February

---

[20] The fair report privilege is commonly exercised by newspapers, broadcasting stations and others who are in the business of reporting news to the public. It is not, however, limited to these publishers. It extends to any person who makes an oral, written or printed report to pass on information that is available to the general public. Restatement (Second) of Torts § 611 (1977).

[21] As noted above, Defendant contends that its testimony before Congress was subject to absolute immunity.

4, 2019)[22] involve comments that were clearly statements of opinion rather than actionable defamation. (Doc. No. 32 at 18). Defendant asserts that the context of these remarks was in reference to compliance with Defendant's Code of Ethics. Plaintiffs, on the other hand, argue that these statements either imply or explicitly state that Plaintiffs' businesses are unethical and dishonest, not in compliance with Defendant's ethics rules, branded in a misleading way, and based on bait-and-switch tactics. (*e.g.,* Doc. No. 27 at ¶¶ 162, 213, 216-18, 308-10 and 317).

The Court agrees with Plaintiffs that, at a minimum, these statements imply (and indeed assume) certain *facts*, namely the occurrence of historical events such as the deployment of particular sales practices—sales practices described in a matter-of-fact way as unethical and out of compliance (with ethical standards). A jury could find that a service provider regarded as having engaged in unethical, non-compliant sales practices could be subject merely to disapproval and scorn, but it also potentially could find that the service provider is subject to worse, *i.e.*, hatred, contempt or ridicule. As it found above in relation to the alleged defamatory statements made before Congress and then republished by Defendant via websites and social media outlets and at the 2018 annual meeting, the Court finds that these alleged statements, in context, are capable of defamatory meaning.

---

[22] The FAC alleges that in the July 30, 2018 edition of *Alcoholism & Drug Abuse Weekly*, Defendant's Executive Director (Ventrell) was quoted as follows: "As for American Addiction Centers, 'My statement to Michael [Cartwright] is that if he wished to come into compliance, I would be happy to speak with him about this but I don't see how he could with his current business model.'" (Doc. No. 27 at ¶ 162). The FAC also alleges that, in an interview with *Alcoholism & Drug Abuse Weekly* published on February 4, 2019, NAATP by and through Ventrell called AAC a "bad actor" and falsely stated that AAC hijacks phone calls and otherwise engages in unethical "bait and switch" marketing practices. (*Id.* at ¶ 213).

Finally, in two sentences, with no citation to authority or development of the argument, Defendant asserts that it cannot be liable for statements of third parties, specifically for alleged statements made to Congress by officers of Caron, Hazelden Betty Ford Center, or Cumberland Heights.[23] Plaintiffs have alleged that "third parties" were acting on behalf of Defendant when the alleged statements were republished (Doc. No. 27 at ¶ 136) and have alleged facts plausibly suggesting (even if only by implication) that third parties were acting on Defendant's behalf both in providing the testimony originally and in republishing it with malice. (Doc. No. 27 at ¶¶ 136-141, 150-52). Whether that testimony was defamatory, and whether the speakers actually were acting on behalf of Defendant, are not matters that can be decided at this stage of the litigation, but Plaintiffs have sufficiently alleged that Tieman and Mishek were acting on behalf of Defendant at the time they made their statements to Congress and at the annual meeting. Moreover, Plaintiffs have sufficiently alleged that Defendant republished these statements through the presentation at the annual meeting and on its websites. (*Id.* at 136).

For purposes of this Motion, the Court finds that Plaintiffs have sufficiently alleged plausible claims for defamation.

## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

In order to establish intentional (tortious) interference with business relationships under Tennessee law, a plaintiff must prove the following: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the

---

[23] Plaintiffs have identified the speakers as Caron Foundation CEO Douglass Tieman and Hazeldon Betty Ford CEO Mark Mishek.

business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from the tortious interference. *Care Servs. Mgmt., LLC v. Premier Mobile Dentistry of VA, LLC*, No. 3:17-cv-01095, 2020 WL 5797974, at *6 (M.D. Tenn. Sept. 29, 2020) (citing *Trau-Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002)). Significantly, the claim can be based on either an existing business relationship or a prospective business relationship. *Walton v. Interstate Warehousing, Inc.*, No. 3:17-cv-1324, 2020 WL 1640440, at *6 (M.D. Tenn. Apr. 2, 2020).

Concerning the fourth element, "improper motive or means," the plaintiff must demonstrate that the defendant's predominant purpose was to injure the plaintiff. *Pearson Educ., Inc. v. C&N Logistics, Inc.*, No. 3:18-cv-00438, 2018 WL 6528128, at *7 (M.D. Tenn. Dec. 12, 2018). In *Trau-Med*, the Tennessee Supreme Court embraced a broad view of what can constitute improper motive and improper means. *Kolstad v. Leehar Distributors, LLC*, No. 3:18-cv-00060, 2018 WL 6832086, at *7 (M.D. Tenn. Dec. 28, 2018). Either improper motive or improper means will suffice. *Watson's Carpet and Floor Coverings, Inc. v. McCormick,* 247 S.W.3d 169, 176 (Tenn. Ct. App. 2007). One such improper means is defamation. *Kolstad,* 2018 WL 6832086, at *7; *Pearson Educ.,* 2018 WL 6528128, at *7.  The Court finds that Plaintiffs' factual allegations of existing and prospective business relationships, Defendant's knowledge of those relationships, Defendant's intent to cause the breach or termination of those relationships, Defendant's improper motive and improper means, and resulting damages (as discussed below) are sufficient to allow Plaintiffs' claim of tortious interference with  business relationships to survive.

The FAC alleges (Doc. No. 27, ¶¶ 335-365) that Plaintiff AAC had existing and prospective business relationships with 300 or more of Defendant's members, many of which paid to advertise on AAC's directory websites. (*Id.* at ¶ 336). In addition, Plaintiffs AAC and ALA had existing and

prospective business relationships with a number of Defendant's members to whom they sold or wanted to sell lab testing services. (*Id.* at ¶ 337). Plaintiffs allege that Defendant was well aware of these existing and prospective business relationships (*Id.* at ¶¶ 339-40) and threatened, pressured, and/or intimidated its members to stop doing business with AAC and ALA (as to directory and lab testing services). (*Id.* at ¶¶ 341-45). Plaintiffs allege that Defendant made false and disparaging statements about Plaintiffs to its members, causing such members to end their existing business relationships with Plaintiffs and/or not enter into business relationships with Plaintiffs. (*Id.* at ¶¶ 344-45).

Plaintiff AAC also alleges that it had an existing and prospective business relationship with Google to use Google's marketing services[24] and that Defendant was well aware of that existing and prospective business relationship. AAC alleges that Defendant interfered in its relationship with Google by misrepresenting that AAC's directory websites were unethical, deceptive rogue "lead generators" and "call center aggregators." (Doc. No. 27 at ¶¶ 348-351). Plaintiffs allege that Defendant worked with both Google and LegitScript, using upon false and misleading statements, with the improper purpose of ensuring that AAC would not be certified to participate in, and would be barred from participation in, the advertising services offered by Google, Facebook, YouTube and Bing. (*Id.* at ¶¶ 355-59). AAC additionally alleges that it had prospective business relationships with numerous patients that it could have reached through online advertising had Defendant, who was fully aware of those prospective business relationships, not interfered to preclude such advertising. (Doc. No. 27 at ¶ 360).

---

[24] Plaintiffs also assert that AAC also had a prospective business relationship with LegitScript (of which Defendant was aware and with which Defendant interfered) for this same purpose of participating in advertising services. (Doc. No. 27 at ¶¶ 346, 355-59).

It is clear that a determination of whether a defendant acted "improperly" or possessed an "improper" motive is dependent on the particular facts and circumstances of a given case. *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701, n.5 (Tenn. 2002). The Tennessee Supreme Court has identified numerous examples of improper interference including those means at are illegal or independently tortious, such as misrepresentation or deceit, defamation, and unfair competition. *Id.* Plaintiffs have alleged factual bases to show that Defendant acted with an improper motive and the specific intent to interfere with all these business relationships (*Id.* at ¶¶ 361 and 365) and factual bases to show that AAC suffered damages as a result of Defendant's actions. (*Id.* at ¶¶ 362-364).

Defendant asserts throughout its argument on this claim that Plaintiffs are required or have failed to "demonstrate" certain things. Defendant also argues that Plaintiffs cannot "establish" improper motive. The test, as stated above, is whether Plaintiffs have sufficiently alleged facts to support a claim that is plausible on its face, and the Court finds that they have. Defendant also argues that Plaintiffs have failed to identify any contracts with third parties that were breached because of Defendant's actions, but the existence of a contract is not a requirement for tortious interference with business relationships (see above).

For all these reasons, Plaintiffs have sufficiently alleged tortious interference with business relationships claim, and the Motion as to this claim will be denied.

## BREACH OF CONTRACT/IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

The FAC alleges that AAC's[25] membership in Defendant constituted a contractual relationship whereby AAC paid membership dues and agreed that the then-applicable rules and

---

[25] The parties agree that the reference here to "AAC" includes Plaintiffs AAC and Recovery Brands, which were members of Defendant, but not ALA, which was not. (Doc. No. 32 at 21 and Doc. No. 39 at 29).

bylaws of Defendant established the terms of the parties' relationship. (Doc. No. 27 at ¶ 367). Plaintiffs contend that AAC agreed to follow the then-applicable rules of Defendant and that failure to follow those rules would be grounds for expulsion from membership in Defendant. (*Id.* at ¶ 368). AAC asserts that it did not violate any of Defendant's rules that were in effect when it was a member (the rules to which it agreed to be bound). AAC argues that there were no legitimate grounds under the parties' contract[26] for Defendant to exclude AAC from membership, and yet Defendant excluded AAC, in breach of the contractual relationship between the parties. (*Id.* at ¶¶ 369-70). AAC avers that, by excluding AAC from the benefits of membership without a legitimate reason, Defendant breached the contract and also breached the duty of good faith and fair dealing implied in every contract, resulting in damages to AAC. (*Id.* at ¶¶ 378-81).

Defendant asserts that Plaintiffs have failed to identify any provision of the actual written contract that Defendant allegedly breached. Defendant also contends that Sections 3.6 and 3.7 of the By-Laws (Doc. No. 32-1), which address expiration and termination of membership, "strongly undercut any claim of breach of contract," and that one particular screen of the members' "click-through agreement" (Doc. No. 32-2) requires applicants to adhere to the NAATP Ethics Code.[27] However, Defendant provides no explanation or analysis as to how these provisions apply to the facts alleged by Plaintiffs. (Doc. No. 32 at 22).

---

[26] Plaintiffs refer to the By-Laws as the contract. Defendant contends that the contract also included a "click-through" document made part of its membership application (Doc. No. 32 at 22).

[27] Plaintiffs dispute that the new "Ethics 2.0" rules, upon which Defendant relies, applied to Plaintiffs. They argue, however, that even if those new rules applied, Defendant breached the contract (as amended with the inclusion of the terms (requirements) of Ethics 2.0) because the Ethics 2.0 rules provide for procedural safeguards of notice, a right to respond, and progressive discipline, none of which was provided to Plaintiffs. (Doc. No. 39 at 30).

In response, Plaintiffs likewise cite to Defendant's By-Laws (Doc. No. 32-1),[28] which (at pages 5-6) provide "Membership Definitions and Conditions to Membership." Plaintiffs contend that they did not violate any of the conditions for membership, including the agreement not to engage in any practices that are inconsistent with the NAATP Code of Ethics. Plaintiffs argue that Defendant could terminate its contractual relationship with Plaintiffs only for certain enumerated reasons, and that Defendant breached the contract inasmuch as (according to Plaintiffs) none of those reasons existed at the time of the wrongful termination. (Doc. No. 39 at 29-30).

Under Tennessee law,[29] a viable claim for breach of contract has three essential elements: (1) the existence of an enforceable contract; (2) non-performance amounting to a breach of that contract; and (3) damages caused by the breach of contract. *Carpenter v. Cars Recon, Inc.*, No. 3:17-cv-01156, 2018 WL 6446589, at *3 (M.D. Tenn. Dec. 7, 2018). Plaintiffs have alleged the existence of an enforceable contract, and Defendant has not disputed (and instead has actually filed documents[30] evidencing) that fact. Plaintiffs allege that Defendant breached the contract by terminating AAC's and Recovery Brands' memberships and that the breach resulted in damages to Plaintiffs. The allegation as to Plaintiffs' damages is not conclusory only; rather, Plaintiffs contend that Defendant's breach damaged AAC by keeping AAC from the benefits of

---

[28] Plaintiffs mistakenly cite here to Doc. No. 31-1.

[29] No one disputes that Tennessee substantive law applies in this case.

[30] As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ.*, 219 F.Supp.3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018). Here, these documents are referred to in the FAC and are integral to Plaintiffs' breach of contract claim; therefore, the Court has considered them without converting the Motion to one for summary judgment.

membership, keeping it off Defendant's directory, and (via Defendant's alleged power to direct LegitScript) by excluding AAC from the Google Ads platform, resulting in millions of dollars in damages from lost ad revenues, lost patient admissions and lost lab testing revenues. (Doc. No. 27 at ¶¶ 379-80). The Court finds that Plaintiffs have sufficiently alleged a claim for breach of contract. Whether the asserted contract was actually breached is a question for a later stage in this litigation.

It is well established that, in Tennessee, the common law imposes a duty of good faith in the performance of contracts. *Walton v. Interstate Warehousing, Inc.*, No. 3:17-cv-1324, 2020 WL 1640440, at *9 (M.D. Tenn. Apr. 2, 2020); *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 660 (Tenn. 2013). The "breach of the duty of good faith and fair dealing 'is not a cause of action in and of itself but is a part of a breach of contract cause of action.'" *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 699 (M.D. Tenn. 2018) (quoting *Doe v. Univ. of the South*, No. 4:09-cv-62, 2011 WL 1258104, at *18 (E.D. Tenn. Mar. 31, 2011)). It may be more apt to say that the duty of good faith and fair dealing is a part of every contract. The implied covenant of good faith and fair dealing creates a duty to provide basic fairness. *Id.*[31] Although the implied covenant does not create new contractual rights or obligations, it protects the parties' reasonable expectations as well as their rights to receive the benefits of their agreement. *Dick Broad.*, 395 S.W.3d at 666; *see also Clippinger v. State Farm Mut. Automobile Ins. Co.*, No. 2:20-cv-02482-TLP-cgc, 2020 WL 6750357, at *7 (W.D. Tenn. Nov. 17, 2020). Thus, "there is an implied covenant of good faith and fair dealing in every contract, whereby neither party shall do anything

---

[31] In some cases, the courts have expressed this principle as allowing the qualifying word "reasonable" and its equivalent "reasonably" to be read into every contract where pertinent. *Dick Broad.*, 395 S.W.3d at 661.

which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dick Broad.*, 395 S.W.3d at 662 (quoting 17A Am. Jur. 2d *Contracts* § 370 (2004)).[32]

As indicated, Plaintiffs allege that by excluding them from membership in NAATP (and the benefits thereof) without a legitimate reason (and, alternatively, without providing reasonable notice, due process, or opportunity to be heard), Defendant breached the duty of good faith and fair dealing implied in their contractual relationship. Plaintiffs also aver that by announcing the adopting of new ethics rules and, on the same day, before those rules were technically even in force, excluding AAC from Defendant's membership for allegedly failing to comply with those new rules, Defendant breached its duties of good faith and fair dealing. (Doc. No. 27 at ¶¶ 377-78). Plaintiffs thus have plausibly alleged that Defendant in bad faith interfered with AAC's prerogative to enjoy the benefits of its (membership) contract with Defendant; this means Plaintiffs have plausibly alleged breach of the covenant of good faith and fair dealing as that covenant (and its actual operation) is properly construed. In practical effect, it means that Defendant potentially

---

[32] One might wonder what good the covenant does a party if the party cannot bring a (stand-alone) claim based on its breach. It appears to the undersigned that the answer to this question is generally not well understood, but he has a pretty specific take on this issue. The general idea, at least in pertinent part, seems to be that one party cannot in bad faith get in the way of the counterparty's satisfaction of a contract condition that would result in the counterparty's realization of a benefit under the contract. In the Court's view, the following hypothetical demonstrates the principle. If a landowner agrees to pay a painter a $10,000 commission if she completes a "satisfactory" landscape of the landowner's estate, the landowner breaches the covenant of good faith and fair dealing—and thus the contract—if he stops allowing the painter onto his estate after the painter has completed most of the painting; the covenant protects the painter from the argument that she, not having "completed" a "satisfactory" landscape, is contractually not entitled to a commission. And she therefore can bring a claim for breach not of the covenant of good faith and fair dealing per se, but rather of the promise to pay for the painting. That is to say, breach of the covenant is essentially the underpinning of a claim for breach of that promise.

is liable for damages (whatever they may be)[33] for the alleged breach of its promise to extend member benefits to AAC (a breach caused in the first instance by the breach of the covenant).

Defendant argues only that Plaintiffs cannot establish a breach of contract claim and, therefore, there is no corresponding duty of good faith and fair dealing. Because the Court has found that Plaintiffs have sufficiently stated a claim for breach of contract, it likewise finds this argument without merit.

## TENNESSEE CONSUMER PROTECTION ACT

The Tennessee Consumer Protection Act ("TCPA") prohibits the use of "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce."  Tenn. Code Ann. § 47-18-104(a); *Best Choice Roofing & Home Improvement, Inc. v. Best Choice Roofing Savannah, LLC*, 446 F. Supp. 3d 258, 271–72 (M.D. Tenn. 2020). A "deceptive" act or practice is one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as a matter of fact. *Id.* at 272 (citing *Audio Visual Artistry v. Tanzer*, 403 S.W.3d 789, 810 (Tenn. Ct. App. 2012)).

In order to recover under the TCPA, a plaintiff must prove that (1) the defendant engaged in an unfair or deceptive act and (2) the defendant's conduct caused an ascertainable loss of money or property. *Best Choice*, 446 F. Supp. 3d at 272 (citing *Tanzer,* 403 S.W.3d at 810). As to the second element, the alleged unfair or deceptive act or practice must in fact cause the damages of which the plaintiff complains. *Id.* Because the TCPA is remedial, courts have determined that it should be construed liberally in order to protect the consumer. *Miolen v. Saffles*, No. E2018-00849-COA-R3-CV, 2019 WL 1581494, at *8 (Tenn. Ct. App. Apr. 12, 2019). Whether a particular

---

[33] The Court expresses no opinion about the nature and full scope of such damages, including whether they would include the full scope of alleged consequential damages Plaintiffs might claim for this breach in particular.

representation or act is "unfair" or "deceptive," within the meaning of the TCPA, is a question of fact. *Id.* at *9. One of the specific unfair or deceptive acts identified in the TCPA is "[d]isparaging the goods, services or business of another by false or misleading representations of fact." Tenn. Code Ann. § 47-18-104(b)(8).

Plaintiffs have identified nine specific ways in which Defendant allegedly made disparaging, false and/or misleading representations of fact in the conduct of trade or commerce, plus a "catch-all" allegation for "any and all other disparaging statements set forth in the First Amended Complaint." (Doc. No. 39 at 31-32; Doc. No. 27 at ¶ 383). Plaintiffs allege they have suffered an ascertainable loss as a result of Defendant's willful and knowing misrepresentations. (*Id.* at ¶¶ 392-94).

Defendant maintains that, to the extent these claims relate to any alleged communications with Google and LegitScript, those claims are time-barred by the applicable one-year limitations period. Tenn. Code Ann. § 47-18-110 provides that any action under the TCPA "shall be brought within one (1) year *from a person's discovery of the unlawful act or practice*." (emphasis added). As explained above, Plaintiffs contend that Defendant's misrepresentations to Google and LegitScript were not and could not have been reasonably discovered[34] until Defendant's 2018 meeting on May 20-22, 2018, when Plaintiffs first knew that Defendant had been defaming

---

[34] Under this "discovery rule," a TCPA cause of action accrues, and the statute of limitations begins to run, "'when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant.' " *Best Choice Roofing*, 446 F. Supp. 3d at 274 (citing *Montesi v. Nationwide Mut. Ins. Co.*, 970 F. Supp. 2d 784, 789 (W.D. Tenn. 2013) (quoting *Almanza v. Baird Tree Serv. Co.*, 2012 WL 4758276, at *7 (E.D. Tenn. Oct. 5, 2012)). That is to say, although the statute textually appear to refer to the time discovery *actually* occurred, the limitations period instead begins running from the time that discovery *should have occurred*, if that is earlier. Here, Plaintiffs are content with assuming that the limitations did begin running from the earlier time, and they argue that even the "should have been discovered" standard does not render their claim untimely.

Plaintiffs to Google and LegitScript. (Doc. No. 39 at 18 and 33). The Court cannot determine when these misrepresentations could have reasonably been discovered at this time. Plaintiffs have sufficiently alleged that they were not reasonably discoverable until the 2018 annual meeting.

Second, Defendant argues that it is a trade association and does not engage "in the conduct of any trade or commerce," as those terms are defined in the TCPA, stating that Plaintiffs cannot point to any advertising or offering of services for sale by Defendant in which Defendant engaged in deceptive conduct. Plaintiffs respond that Defendant competes with Plaintiffs in the online directory advertising business by specifically providing online directory services as part of the consideration for membership fees paid to it by addiction treatment providers.[35] Plaintiffs assert that the misrepresentations at issue were made to potential customers of both Plaintiffs and Defendant. As explained above in connection with Plaintiffs' Lanham Act and defamation claims, Plaintiffs have set forth facts showing that the alleged misrepresentations and defamatory statements were made at Defendant's annual meeting, on its websites, in trade journals and other nationally circulated written media, and otherwise to potential customers of both Defendant and Plaintiffs. The Court finds that this alleged factual content is sufficient to allege that Defendant engaged in commerce at the time of the alleged misrepresentations and defamatory statements.

Defendant next contends that just as the TCPA does not apply to employer-employee relationships, it should not apply to relationships between a trade association and one of its

---

[35] Although the TCPA's focus is on protecting consumers, the fact that Plaintiffs are competitors of Defendant is not an automatic bar to Plaintiffs' TCPA claim. *See RyMed Techs., Inc. v. ICU Med., Inc.*, No. 3:10-01067, 2012 WL 4505896, at *2 (M.D. Tenn. Sept. 28, 2012); *Affinion Benefits Group, LLC v. Econ–O–Check Corp.*, 784 F.Supp.2d 855, 879 (M.D. Tenn.2011) ("As an initial matter, it is clear that Affinion's status as a competitor and a corporation does not deprive it of standing to bring a claim under the TCPA"); *see also Asurion, LLC v. SquareTrade, Inc.*, 407 F. Supp. 3d 744, 751 (M.D. Tenn. 2019) (allowing TCPA claim brought by competitor to proceed to trial).

members. The cases Defendant cites for this argument are not Tennessee cases, except for *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.,* 876 S.W.2d 818 (Tenn. 1994), in which the court found it unnecessary to reach the issue (but noted that other states' courts had found that consumer protection laws do not apply to disputes arising in the context of employer-employee relationships). *Id.* at 822. Defendant has not cited any case that holds that the TCPA does not apply to trade associations and their members. Neither has it developed this argument, as applied to the allegations of the FAC, in any way.

Finally, in a brief argument, Defendant states that the alleged disparaging communications alleged in the TCPA claim were merely statements of opinion and not actionable under the TCPA. (Doc. No. 32 at 24). The Court above has addressed the supposed "opinion" status of these communications and finds that, again, Plaintiffs have sufficiently alleged a factual basis for finding that the alleged statements are not opinions and that they plausibly suggest a valid claim for false and disparaging statements, not opinions.

For these reasons, Plaintiffs have sufficiently alleged a plausible claim under the TCPA for purposes of a motion to dismiss, and the Motion will be denied with respect to this claim as well.

<u>CONCLUSION</u>

The Court above has addressed at some length some rather specific (if not always thoroughly briefed) arguments and aspects of Plaintiffs' claims and of Defendant's arguments for their dismissal. But it is also worth taking a proverbial step back to look at the big picture and why it likewise supports denial of the Motion. A plaintiff satisfies *Iqbal* and *Twombly*—generally irrespective of what the defendant has to say now or what it might prove later—if it (a) sets forth cognizable legal theories, (b) alleges factual matter (rather than mere conclusions and other content that does not count in the Rule 12(b)(6) analysis) to plausibly support recovery under those

theories, and (c) does not shoot itself in the foot by pleading facts that somehow show affirmatively that it is necessarily barred from relief (via either an affirmative defense or a patent inability to establish its own theory). If a plaintiff can do these things (as plaintiffs of course are frequently able to do), it will survive a motion to dismiss for failure to state a claim, no matter whether (a) the factual allegations are true, and (b) the defendant has some good affirmative defenses. The defendant may or may not prevail eventually, but it simply has no real shot of prevailing on a motion to dismiss if the plaintiff does the above-referenced three things.

Plaintiffs have done those things here, pleading cognizable legal claims that would be supported by the alleged non-conclusory facts to the extent they prove to be true. Most notably, Plaintiffs, perhaps to a fault,[36] have alleged copious factual matter to support its various claims. Therefore, all of their claims survive at this stage.

For this reason, the Motion will be denied.

An appropriate order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[36] At times, Plaintiffs (with an 89-page complaint) arguably seemed to come somewhat into conflict with Rule 8's admonition that a complaint comprise a "short and plain" statement of claims. But ultimately the Court can live with Plaintiffs drafting it the way they did, since, after all, they do bear the burden of alleging sufficient factual matter to support their legal theories of recovery and thus can generally be forgiven for erring somewhat on the side of excessive detail.